UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| FRANK MARTIN SONS, INC., | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )  07-CV-180-B-W |
| | ) |
| JOHN DEERE CONSTRUCTION & | ) |
| FORESTRY COMPANY, | ) |
| | ) |
| Defendant | ) |

**RECOMMENDED DECISION ON PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

Frank Martin Sons, Inc., has brought suit against John Deere Construction & Forestry Company, to enjoin it from terminating a franchise relationship arising from four dealer agreements. Because action has already been taken to terminate the relationship, Frank Martin Sons has filed a motion for a temporary restraining order setting aside the termination pending the outcome of this litigation. The Court referred that motion to me and I now recommend that the Court adopt the following proposed preliminary findings and deny the motion.

**Facts**

Frank Martin Sons (FMS) has operated a heavy equipment dealership in Fort Kent since 1952 selling, among other lines, certain John Deere equipment. Three generations of the founding family have worked to keep the franchise going into its sixth decade of operation. John Deere Construction & Forestry Company (JDCFC) had given FMS an appreciable area of responsibility, including all of Aroostook County. In August and

September of 2007, JDCFC employees conducted an audit of FMS's warranty service claims. JDCFC franchises use an online claims system to submit warranty claims to JDCFC. On November 15, 2007, JDCFC's director of "retail channel development," Richard Buchignani, notified Steve Ouellette, the secretary and general manager of FMS, that the FMS franchise was terminated, "effective immediately," based on JDCFC's determination that FMS had submitted false claims for warranty reimbursement using the online claims system. (Buchignani Letter, Compl. Ex. 4, Doc. No. 1-5.) Buchignani attests that he personally delivered the letter to Steve Ouellette and David Ouellette (another FMS principal) in Fort Kent on November 15, 2007. (Buchignani Aff. ¶ 31.) Buchignani asserted in the letter that the termination was justified based on the following kinds of misrepresentations:

> (a) misrepresentation of machine and part serial numbers to secure warranty coverage on machines not eligible for warranty coverage;
>
> (b) misrepresentation of non-Deere parts as Deere parts to secure higher rates of reimbursement;
>
> (c) replacement of non-faulty parts to generate warranty reimbursement claims;
>
> (d) misrepresentation of the nature of a part's failure to obtain warranty reimbursement from Deere;
>
> (e) misrepresentation of FMS's non-warranty labor rate in order to secure a higher warranty labor reimbursement from Deere; and
>
> (f) misrepresentation of customer's complaints in order to qualify a repair for warranty coverage.

(Buchignani Letter at 1-2.) Based on these findings, Buchignani informed Ouellette that FMS was in default under section 7(a)(viii) of the security agreement. (Id.) In addition, Buchignani asserted that FMS was in violation of the service administration manual and

provisions in two dealer agreements that required FMS to maintain appropriate documentation in support of its warranty claims.  (Id.)

In its motion, FMS asserts that its warranty claims practices have never before been criticized by JDCFC and have been consistently submitted in accordance with JDCFC guidelines without any prior incident.  (Mot. for TRO at 4-5.)  FMS argues that the alleged violations do not properly fall under the dealer agreements and that disputes over warranty claims are not properly governed by the security agreement.  (Id. at 7.)

> There are four dealer agreements in the record and one security agreement:
>
> The John Deere Industrial Equipment Company[1] Authorized Industrial Dealer Agreement Construction Equipment (Construction Equipment Agreement, Compl. Ex. 1 at 1-10, Doc. No. 1-2);
>
> the John Deere Industrial Equipment Company Authorized Industrial Dealer Agreement Utility Equipment (Utility Equipment Agreement, id. at 11-20);
>
> the John Deere Industrial Equipment Company Authorized Industrial Dealer Agreement Forestry Equipment (Forestry Equipment Agreement, id. at 21-26);
>
> the John Deere Construction & Forestry Company Special Products Dealer Agreement (Special Products Agreement, id. at 27-50); and
>
> the John Deere Industrial Dealer Security Agreement (Security Agreement, Compl. Ex. 2, Doc. No. 1-3).

All of the dealer agreements contain a section authorizing JDCFC to immediately terminate a dealer agreement for cause based on a default by the dealer under a security agreement with JDCFC.  (Constr. Equip. Agreement ¶ 2(d), Compl. Ex. 1 at 4;  Util. Equip. Agreement ¶ 2(d), Compl. Ex. 1 at 14;  Forestry Equip. Agreement ¶ 2(d), Compl. Ex. 1 at 24;  Special Prod. Agreement ¶ 2(c)(iv)(b), Compl. Ex. 1 at 35.)  The Special Products Agreement also provides for immediate termination if the "[d]ealer defrauds

---

[1]     JDCFC is a successor to the John Deere Industrial Equipment Company.

anyone, including without limitation JDCFC, or misrepresents any material fact in any communication with or submission to JDCFC." (Special Prod. Agreement ¶ 2(c)(iv)(d).) Among other "acts of default" identified in the Security Agreement is the "falsification of records, contracts, reports or any other documents which the Dealer has submitted to [JDCFC]." (Security Agreement ¶ 7(a)(viii), Compl. Ex. 2 at 3.)[2] Another material document is JDCFC's service administration manual (SAM) dated April 2006. (Buchignani Aff. Exs. 7a, 7b, 7c, Doc. No. 20-12, 20-13, 20-14.) The SAM sets out JDCFC's guidelines for submission and documentation of warranty reimbursement claims, among other things.

FMS's initial submission in support of its bid for a TRO consisted of the dealer agreements, the security agreement, the termination letter, and a Wall Street Journal article concerning Deere & Company's drive to consolidate dealers in its Agricultural Equipment Division, all introduced through the verified complaint. (Compl. Exs. 1-4.) Although the Wall Street Journal article makes interesting reading, it is not apparent that the article is relevant to any business objectives undertaken by JDCFC, as opposed to another John Deere entity.[3] JDCFC attests, through Mr. Buchignani, that it is not engaged in any effort to consolidate its dealer network. (Buchignani Aff. ¶¶ 10-12.) This evidence is offered because FMS contends in its motion that JDCFC's fraud claims are a

---

[2] These documents are also submitted as exhibits to Mr. Buchignani's responsive affidavit. (Doc. No. 20). It is much easier to view all of these documents at once under docket entry 1 rather than individually or partially under docket entry 20. Because the Buchignani affidavit exhibits have a combined file size in excess of 10 megabytes, it is not possible to view them all at once using CM/ECF. Moreover, many documents are broken into multiple parts in the electronic attachments filed with the Buchignani affidavit.

[3] The article refers to "Deere & Co." and talks of farming and agriculture as the focus of a concerted dealer consolidation drive. Ilan Brat and Timothy Aeppel, *Out to Pasture, Why Deere is Weeding Out Dealers Even as Farms Boom*, Wall St. J., Aug. 14, 2007, at A1. (Compl. Ex. 3.) The dealer agreements that are at issue in this case do not concern farming and agricultural equipment. Mr. Buchignani's affidavit supports a finding that the article is talking about another John Deere enterprise and not JDCFC. (Buchignani Aff. ¶¶ 10-12.)

4

pretext JDCFC is using to eliminate FMS as a JDCFC dealer, when the true reason for its actions is that it is pursuing an effort to consolidate dealerships.  In its reply papers, FMS does not counter the assertion that the Wall Street Journal article has nothing to do with JDCFC, but it introduces another salient piece of evidence.  Specifically, JDCFC's corporate predecessor, John Deere Industrial Equipment Company, articulated, in a 1994 "dealer strategy" letter, a "desire to conduct business with one entity in Maine, with one statement and one corporate name."  (Dealer Strategy Letter, Ouellette Aff. Ex. 1, Doc. No. 26-2.)  This letter is evidence of a desire on the part of JDCFC to funnel all sales and related activity through one entity in Maine.

FMS contends that JDCFC's actions are anticompetitive, because FMS keeps down the prices on JDCFC products.  The implication is that JDCFC would raise its prices in Maine if only it could eliminate FMS as a dealer.  (Mot. for TRO at 19.)  In response to this contention, Mr. Buchignani states that the markets for the sale of forestry and construction equipment are highly competitive in Maine and throughout the country, and that price competition with competitors such as Blount/Prentice, Case, Caterpillar, Komatsu, Tigercat, Volvo, and others already creates ample price competition.  (Buchignani Aff. ¶ 40.)

In opposition to the motion JDCFC submitted two lengthy affidavits and numerous attachments.  Mr. Buchignani's affidavit, already cited, is one.  The other is supplied by a Mr. Bruce Williams, JDCFC's manager of product support operations.  (Williams Aff., Doc. No. 19.)  His affidavit sets forth the circumstances that, according to JDCFC, prompted the termination of FMS's dealer agreements.  Mr. Williams attests that his responsibilities include the administration of dealer warranty claims.  (Id. ¶ 2.)  He

relates that on April 17, 2007, FMS submitted a warranty claim through the electronic warranty claims system for the replacement of a structural frame for a model 648 grapple skidder[4] registered to White Oak, Inc., and bearing serial number DW648GX596876 ("skidder 876"). (Id. ¶ 3.) The claim requested $18,145.75 for the repair and that amount was paid by JDCFC's warranty department. (Id. ¶ 4; Ex. 2 Warranty Claim, Doc. No. 19-3; Ex. 3 Photo, Doc. No. 19-4.) Because the claim related to a potential frame defect, the warranty department brought the claim to the attention of JDCFC's "reliability analysts." (Williams Aff. ¶ 5.) An analyst reviewed the claim and a photo submitted with it and noted that the frame depicted in the photo was from an earlier model skidder than skidder 876. Her observation made its way up to Mr. Williams. (Id. ¶ 6; Ex 4 E-mails, Doc. No. 19-5.) According to Williams, FMS's claim was the first reported failure for a new grapple skidder frame design. JDCFC was concerned that the new design was somehow faulty, so Williams investigated the frame failure further. (Williams Aff. ¶ 7.) He did so by communicating with FMS's warranty administrator, Marc Raymond, in an effort to get clarification, including additional pictures and the frame number on the cracked frame. (Id. ¶ 8; Ex. 7 E-mails, Doc. No. 19-7.) The pictures he received in response were more pictures of an older frame. (Williams Aff. ¶¶ 8-9.) Williams told Raymond that the claim would be charged back to FMS unless FMS could explain why a warranty claim would be submitted for an old machine under the serial number of a new machine. (Id. ¶ 9.) FMS did not contest the findings or supplement its claim information and so, on August 15, 2007, JDCFC charged back the amount of its payment for the repair. Williams attests that FMS never objected to this action. (Id. ¶ 9.)

---

[4] A grapple skidder is a heavy piece of equipment used to drag harvested timber out of the woods. There is a picture of a grapple skidder attached to Williams's affidavit at exhibit 1.

Williams arranged to visit FMS and met with Steve and David Ouellette, FMS dealer principals. (Id. ¶ 11.) Over the course of the visit, which is recounted with more detail in the affidavit, Williams learned that FMS had taken a used skidder ("skidder 172") in trade from White Oak when White Oak purchased skidder 876, and that, after replacing the frame on skidder 172 by using the warranty applicable to skidder 876 (at JDCFC's expense), FMS sold skidder 172 to another enterprise called Chopper One at a significant mark up from its trade-in figure. (Id. ¶¶ 14-18.) Skidder 172 had in excess of 13,000 hours on its meter, roughly equivalent to a year and a half of non-stop, continuous 24-hour operation. (Id. ¶ 17.) Not surprisingly, the pictures of this skidder's frame show a fair amount of wear.

In opposition to this evidence, FMS offers an affidavit from Mr. Steve Ouellette. Mr. Ouellette characterizes the skidder 876 warranty claim as a "mix-up" and asserts that White Oak owned both skidders at the time the repairs were made. (Ouellette Aff. ¶ 27, Doc. No. 26.) He asserts that both machines were at the dealership at the time because it was time for spring service, due to seasonal postponement of forestry and logging activity during the spring thaw. Of course, this does not explain why skidder 876, a new machine, would be in need of any warranty service, so as to be confused with skidder 172, although he implies that the service department does not communicate with the sales department and that such a mix up can arise from the fact that "there are literally dozens" of skidders waiting in the yard for spring service. I find it hard to believe that a brand new machine would be parked in a cluster of used machines awaiting service. Moreover, the record reflects that skidder 876 would have had a shiny new green frame, whereas skidder 172 would have had a deteriorated yellow frame, making an inadvertent mix-up

7

even more unlikely. Presumably someone actually witnessed that the green frame was on skidder 172, either when the frame was being installed in the service department, or when it was being sold to Chopper One. It is difficult to imagine the new frame did not factor into the sales price.

According to Williams, during the course of the paper investigation preceding his visit to FMS, JDCFC reviewed FMS's warranty submission history, discovering in the process that the number of FMS warranty claims was more than three times the North American average for JDCFC dealers. (Williams Aff. ¶ 10.) Steve Ouellette says this fact is not at all surprising, because the majority of its sales are in forestry equipment, which is subjected to heavier use than construction equipment, and because northern Maine winters exact a considerable toll on all heavy equipment. (Ouellette Aff. ¶¶ 20-23.)

During the course of his visit, Mr. Williams and an assistant reviewed a small sample of warranty claims. They noted that every claim was missing the work order that should have been retained to support the warranty claim, which deviated from the SAM guidelines and was highly unusual, in their view, based on their experience with other dealers' practices. (Williams Aff. ¶ 13.) Mr. Ouellette responds, ironically, that this is due to the fact that FMS has taken the trouble to employ a warranty claims administrator to specifically handle its warranty claims and that, because its technicians refer warranty issues to this special employee, the work orders and technician notes never make it into the file. (Ouellette Aff. ¶ 25.) It is a curious argument, in my view, to say that because one person is devoted to this particular task he or she cannot gather the relevant records into a file. In any event, Williams and three assistants subsequently audited a sample of

8

35 additional warranty claims at FMS's location on September 19, 2007. (Williams Aff. ¶ 19.) FMS did not have work orders for any of the reviewed claims. (Id.) The documents that were available did not reflect the alleged defect, actual customer complaint or the specific repairs that were made. According to Williams, they discovered a number of additional false statements as well. (Id. ¶¶ 20, 23-26, 31-40.) Mr. Ouellette offers a rejoinder to these assertions (Ouellette Aff. ¶¶ 38-49), but it is not necessary to fully describe all of these last few allegations of fraud because the pending motion does not depend on them. One relevant charge, however, goes entirely unanswered by FMS. According to Mr. Williams, his audit reflected that FMS inflated its labor rates for purposes of its warranty reimbursement claims, submitting labor rates well in excess of what it actually charges its paying customers for labor. (Williams Aff. ¶¶ 27-30.)

Both Williams and Buchignani point to the foregoing concerns to explain JDCFC's grounds for terminating FMS's franchise. Both characterize the evidence as demonstrative of fraud justifying immediate termination under the respective agreements. (Buchignani Aff. ¶ 28; Williams Aff. ¶ 41.)

Buchignani relates that, as a result of the termination of the dealer agreements, FMS is no longer able to place orders for new machines, no longer has a line of credit with JDCFC, and no longer has access to JDCFC's DealerNet and other systems. Additionally, JDCFC no longer refers its customers to FMS for sales or service and FMS has been removed as an authorized dealer from JDCFC's web site. (Buchignani Aff. ¶ 32.) Buchignani asserts that there simply is no longer any trust to enable it to again do business with FMS and that JDCFC believes it would be at risk of further fraudulent practices that are difficult to monitor, if the requested motion were granted. (Id. ¶ 33.)

According to Buchignani, FMC's loss of JDCFC product lines is not likely to shutter its business.  (Id. ¶ 34.)  He has attached a copy of FMS's October 2007 financial statement, which shows that under 40 percent of FMS sales were in John Deere products and that John Deere-related sales and service account for a similar portion of gross profits.  (Id. ¶¶ 34-35; Buchignani Ex. 10, Doc. No. 20-17.)  Based on its own records JDCFC also asserts that the forestry product line accounts for most of FMS's sales of John Deere branded machines and that the special products line, in particular, has no real significance in terms of FMS's sales volume, there being no sales of any special products in three years.  (Id. ¶¶ 36-37.)  Buchignani asserts, based on the same records, that less than 10 percent of FMS's gross profit comes from sales and service attributable to the Construction Products Agreement.  (Id. ¶ 38.)  He also contends that FMS could readily replace the lost forestry product line with products from other manufacturers whose products FMS already sells.  (Id. ¶ 39.)  Mr. Ouellette does not counter any of these assertions and does not suggest in his affidavit that the loss of the JDCFC franchise would be fatal to FMS's continued operation.

FMS offers an affidavit from Robert McBreairty, Jr., the principle of a logging company bearing the same name, who avers that it would be devastating to his operation to lose a service center for JDCFC products based on the inability of FMS to obtain John Deere parts.  (McBreairty Aff. ¶¶ 9-13, Doc. No. 25.)  He maintains that his operation's exceedingly thin margins would evaporate if he were required to transport equipment to a Bangor service center, or to pay for a traveling serviceman to keep his equipment in working order.  (Id.)

FMS also offers an affidavit from Attorney Michael Dady, who attests to the fact that he contacted JDCFC to request that it continue its dealership relationship with FMS pending a more thorough review of the warranty claims matter, offering to "cause" FMS to "reimburse JDCFC on any warranty claims that JDCFC reasonably asserted to be invalid." (Atty. Dady Aff. ¶¶ 2-3, Doc. No. 24.)

## Discussion

Four elements govern the Court's determination of the pending motion for preliminary, injunctive relief:

 (1) the probability of the movant's success on the merits;
 (2) the prospect of irreparable harm absent the injunction;
 (3) the balance of the relevant equities (focusing upon the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does); and
 (4) the effect of the court's action on the public interest.

Matos v. Clinton Sch. Dist., 367 F.3d 68, 73 (1st Cir. 2004); Virzi Subaru v. Subaru of New England, 742 F.2d 677, 679 (1st Cir. 1984) (recounting a district court's application of those factors in a case involving a franchise termination, but principally addressed to a matter involving attorney fees); Surplec, Inc. v. Me. Pub. Serv. Co., 495 F. Supp. 2d 147, 149 (D. Me. 2007).[5]

---

[5] FMS argues (Mot. for TRO at 8-9) that the traditional, four-element burden to obtain preliminary injunctive relief does not apply here because the Maine statute that governs power equipment franchises authorizes a dealer injured by a violation of the statute to "bring an action to enjoin the violation and to recover damages arising from the violation." 10 M.R.S. § 1362. FMS cites Esso Standard Oil v. Monroig-Zayas, 445 F.3d 13, 16 (1st Cir. 2006). I do not find this argument persuasive. In Esso, the First Circuit addressed preliminary injunctive relief under the Petroleum Marketing Practices Act, which "offers a preliminary injunction standard to franchisees that is more forgiving than the common law standard." Id. at 16 (citing 15 U.S.C. § 2805(b)(2)). A comparison of the language of that federal statute and the language of the Maine statute reflects that the Maine statute simply does not prescribe any standard at all, unlike the federal statute, so that the common law standard should presumably apply here. Regardless, even if a lesser standard were employed, that standard would at least require FMS to demonstrate a likelihood of success on its claim of a statutory violation. My recommendation that the motion be denied turns on that very factor.

FMS's bid for preliminary injunctive relief is premised on the protections afforded by Chapter 211-A of the Maine Revised Statutes, Franchise Laws for Power Equipment, Machinery and Appliances, 10 M.R.S. §§ 1361-1370 ("the Act"). The Act prohibits conduct "that is arbitrary, in bad faith or unconscionable and that causes damage to another manufacturer, distributor or dealer or to the public." Id. § 1363(1). The Act also prohibits certain conduct that it characterizes as unfair within a franchise relationship. Most pertinent to this dispute is a provision that prohibits manufacturers from terminating or failing to renew a franchise relationship with a dealer without "good cause." Id. § 1363. The Act restricts a "good cause" analysis to four possible scenarios:

(1) a scenario in which the dealer fails to comply with a reasonable and materially significant provision of the franchise agreement that does *not* concern "performance by the . . . dealer in sales or service," provided that the manufacturer acts on that failure within 180 days, id. § 1363(3)(C)(1);

(2) a scenario in which the dealer fails to comply with a reasonable and materially significant provision of the franchise agreement that *does* concern "performance by the . . . dealer in sales or service," provided that (a) the dealer receives written notice of the failure, including a reference to the statutory provision, and at least six months to attempt in good faith to meet the performance provision; *and* (b) the dealer was not in compliance through the 180-day period that preceded the giving of formal written notice; *and* (c) the dealer fails to substantially comply with reasonable performance criteria, id. § 1363(3)(C)(2);

(3) a scenario in which the manufacturer and dealer agree to terminate the franchise, id. § 1363(3)(C)(3); and

12

(4) a scenario in which the manufacturer stops producing or distributing the franchise goods, id. § 1363(3)(C)(4).

The Act authorizes dealers damaged by a violation to bring an action to enjoin the violation and for related damages. Id. § 1362. Notice provided under the Act must be delivered by registered, certified or other receipted mail, or else be delivered by telegram or in person to the dealer. Id. § 1366.

**A.      Whether, and to what extent, the Act applies to the subject agreements.**

Before considering the likelihood of success on the merits in relation to the strictures of the Act, JDCFC contends that the Act only applies to the Special Products Dealer Agreement because all of the other agreements were executed before the Act came into effect and those original agreements have not been supplanted by new agreements subsequent to the effective date of the Act. (Opposition Mem. at 16-18, Doc. No. 18.) In Rolec, Inc. v. Finlay Hydrascreen USA, Judge Hornby ruled that retroactive application of the Act in question would be unconstitutional and that, therefore, a claim brought under the Act, which was effective as of October 1993, could not proceed based on a franchise agreement entered into prior to that date. 917 F. Supp. 67, 67-68 (D. Me. 1996). FMS argues that the holding of Rolec does not apply here because of an amendment to the Security Agreement that postdated the effective date of the Act. (Reply Mem. at 9.) The record reflects that all of the dealer agreements except for the Special Products Dealer Agreement were executed in 1984 and have remained in place since that date. (Compl. Ex. 1; Buchignani Aff. Exs. 1, 2, 3.) Like those agreements, the Security Agreement was also executed in 1984 and remains in place to this date. (Compl. Ex. 2,; Buchignani Aff. Ex. 4b). All of these agreements were amended subsequent to

the effective date of the Act.  The amendments to the dealer agreements exclusively modified the territory of the franchise and FMS has not contended that these territorial changes were material or substantial to its franchise.  The amendment to the Security Agreement expanded the scope of the security interest given by FMS in order to support additional financing.  (Compl. Ex. 2 at 10; Buchignani Aff. Ex. 4c at 4-5.)  The parties dispute and cite case law addressed to the question of what kind of amendments are significant enough to make these agreements fresh for purposes of applying the Act without concern over any retroactive application.  (Opposition Mem. at 18; Reply Mem. at 9-10.)  The parties agree that there must be a "significant or material alteration of the relationship between the parties for a new contract to exist which postdates the Act." Bitronics Sales Co. v. Microsemiconductor Corp., 610 F. Supp. 550, 557 (D. Minn. 1985) (concluding that a modification that reduced sales territory was not enough to override retroactivity concerns).  (See Opposition Mem. at 18; Reply Mem. at 10.)  They disagree whether the amendments at issue reflect a material alteration of their relationship.  FMS focuses on the amendment of the Security Agreement, saying that it reflects "a significantly broader financing commitment."  (Reply Mem. at 10.)  JDCFC says the Security Agreement is immaterial in any event because it is not a franchise agreement.  (Opposition Mem. at 18 n.9.)  FMS says it is because the Act expressly brings security agreements within its scope.  (Reply Mem. at 10-11, citing 10 M.R.S. § 1364.)  I conclude that the amendments to the dealer agreements are likely not sufficient to give rise to a new relationship, primarily because FMS does not contend that those modifications effected a substantial or material change to its actual operations.  I also conclude that the amendment to the Security Agreement is a proper focus for this

discussion because the Act does extend to such agreements and because it is an alleged default under the Security Agreement that JDCFC relies upon to justify the termination of the franchise. Nevertheless, whether that amendment effected a substantial or material change in the relationship seems, to me, to be at least a mixed question of fact that cannot readily be determined on the paper record I have before me. Accordingly, for the sake of argument, and for the sake of this recommendation, I assume that all of the agreements in the record are subject to the Act and not solely the Special Products Dealer Agreement first executed in 2002. I conclude that this is an appropriate way to proceed because, regardless of the concern over retroactive application of the Act, JDCFC's "good cause" presentation concerning material default by way of false representations is a significantly troubling presentation and the response FMS has given to it does not demonstrate a likelihood of success on the merits.

**B.      Likelihood of success on the merits.**

FMS contends that its claim under the Act falls under the second scenario discussed above, the scenario that governs a failure in regard to a dealer's performance in sales and service. (Mot. for TRO at 13.) According to FMS, the termination must relate to its service because JDCFC complains, in part, about its failure to comply with claims guidelines set forth in the SAM (service administration manual). (Reply Mem. at 13.) I reject this contention. In its termination letter, JDCFC claimed that FMS had falsified its warranty claims and failed to maintain records. To my view, falsification of warranty claims and non-compliance with record keeping obligations are not really matters of sales or service performance. Rather, a failing in the sales or service arena would involve issues like lackluster sales volume or inadequate servicing of JDCFC's customers and

products.  A dealer's claim for warranty reimbursement is an accounting or bookkeeping function that arises out of the provision of warranty service to customers, but it is not service to any customer.  For that reason, I conclude that the stated grounds for the termination fall under the first scenario, which is addressed to a failure to comply with a reasonable and materially significant provision of the franchise agreement.  Here, the relevant provisions are found in section 2(d) of the various dealer agreements, which make a "default" under the security agreement an "immediate cause for termination," and section 7(a)(viii) of the security agreement, which treats as a default the "falsification of records, contracts, reports or any other documents which the Dealer has submitted to the Company."

Under the first scenario JDCFC must give FMS notice of termination in person within 180 days of default, which it did.  As for good cause, the evidence adduced by JDCFC clearly does implicate reasonable and materially significant provisions of the franchise agreements.  FMS's argument that the termination was improper because it does not really implicate any provisions of the dealer agreements is exceedingly strained, particularly as it essentially made no effort whatsoever in its initial motion to counter any of the serious charges in the letter of termination despite being on notice of the same.  Moreover, the Ouellette affidavit offered in reply raises a fair amount a skepticism about how the skidder 876 matter could be a mere "mix-up" and fails entirely to address the matter of submitting inflated labor rates.  In short, I conclude on the basis of the paper record that FMS has failed to demonstrate a likelihood of success on the merits of its

claims.[6] Failure to meet this most important element of its burden obviates any need to discuss the other elements. Nevertheless, I have sketched out the competing arguments on the remaining issues to give the Court a fuller picture of the parties' contentions.

**C.     Irreparable Harm**

There is an issue in this proceeding whether partial loss of a business is an irreparable injury for which there is not an adequate remedy at law. See Augusta News Co. v. News Am. Publ'g, Inc., 750 F. Supp. 28, 31-32 (D. Me. 1990) (discussing Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1970)). FMS contends that the termination of its dealer agreements with JDCFC will essentially end a multi-generation, five decades old business that is essential to northern Maine logging operations and other enterprises. (Mot. for TRO at 1-2.) JDCFC responds with evidence suggesting that its product lines account for about 40 percent of FMS's sales and service volume and that competing products from other manufacturers are already carried by FMS and could fill the void left by JDCFC's termination of the franchise. (JDCFC's Opposition Mem. at 26-28; Buchignani Aff. ¶¶ 32-39.) Notably, the Ouellette affidavit offered in reply is silent on this matter, which leaves the record unbalanced and tipping in favor of JDCFC, another reason to deny the motion.[7]

**D.     Balance of Equities**

This element is essentially in equipoise. On the one hand there is the diminution of FMS's dealership, which is an appreciable harm even if it is not irreparable. (Mot. for

---

[6]     It may not be clear under the Act which party has the burden of persuasion on the "good cause" issue. I assume for purposes of this discussion that JDCFC would have to prove by a preponderance of the evidence the facts it claims give rise to the "good cause" for termination.

[7]     If the Court considered it necessary to revisit the constitutional question addressed in Rolec, and concluded that the amendments to the agreements in this case were not substantial and material, then the only dealer agreement subject to the Act would be the Special Products Dealer Agreement, which appears to have generated zero sales in the last three years. Loss of this line would not be irreparable injury to FMS.

17

TRO at 15-17.)  On the other hand there is JDCFC's desire to no longer do business with an entity that it believes engaged in a pattern or practice of fraud in relation to its warranty reimbursement claims.  (JDCFC's Opposition Mem. at 28.)

### E.     The Public Interest

To the extent it applies, the Act implies that there is an inherent public interest in play here because the Act establishes a "public policy" that actions taken in violation of the Act are void and unenforceable.  10 M.R.S. § 1368.  Of course, it is necessary that the Act have been violated in the first place and, as stated already, it does not appear likely that FMS will be able to establish that on the record produced thus far.  The McBreairty affidavit is obviously offered to address this factor, too.  That affidavit supports a finding, which is supported by common sense as well, that there will be people in the northern Maine market whose business operations will be frustrated to some extent by FMS's inability to obtain John Deere parts or to perform warranty service on JDCFC equipment.  Unfortunately for FMS, success on this solitary element is not sufficient to justify the imposition of preliminary injunctive relief.

### Conclusion

The evidence marshaled for purposes of the pending motion reflects that FMS's claims have significant legal and factual obstacles.  In my view, these obstacles make it relatively unlikely that FMS will succeed on the merits of its claims.  For that reason, I RECOMMEND that the Court DENY the motion.  In this recommended decision I have recited proposed preliminary factual findings based on the paper record before me.  In my view, the point of a TRO would be rendered meaningless if I conducted a full evidentiary hearing in order to make the credibility and materiality determinations that would have to

be made before this case could be finally resolved. The matter was referred to me for a recommended decision on a motion for a temporary restraining order. My recommendation that the court deny that motion is, of course, without prejudice to FMS's right to seek a full evidentiary hearing on a motion for preliminary or permanent injunction. Based upon my review of the current record, and assuming JDCFC has the burden of showing good cause for the termination, I simply cannot find that FMS has shown a likelihood of success on the merits. While a "rush to judgment" should always be avoided, a motion for temporary restraining order sometimes forces the court to do just that. In this case, based on the current record, the transaction involving the skidder 172 frame appears to be an unvarnished attempt by FMS to line its own pockets at the expense of JDCFC, a fraudulent act and a default under the security agreement.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

December 14, 2007